UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

RAUL M. ESPITIA,                                     :     Case No. C-1-00-531
                                                     :
    Plaintiff,                                :
                                                     :     Judge Herman J. Weber
                                                     :
    v.                                        :
                                                     :
THE PROCTER & GAMBLE                                 :     **MOTION FOR SUMMARY JUDGMENT**
COMPANY, et al.,                                     :     **OF DEFENDANT THE PROCTER &**
                                                     :     **GAMBLE COMPANY**
    Defendants.                               :

Defendant The Procter & Gamble Company fully moves this Court for Summary Judgment in its favor on all claims which are alleged against in Plaintiff's Complaint (Counts III-VII), as there is no genuine issue of material fact, and Defendant is entitled to judgment as a matter of law. This motion is supported by the pleadings, the depositions of the Plaintiff, Patrick Tewksbury, Barbara Lancor, Joe Beer, Mary O'Rourke, Tonya King, Michael Lindsey, Kim Zimmer, Tom Winters, Dwain Carver, Steve Lighthall, Tom Brown, Ray Maynard, Jeff Drago and the Memorandum hereto attached.

Respectfully submitted,

_____
Michael S. Glassman (0012713)
Tammy R. Geiger (0071533)
DINSMORE & SHOHL, LLP
1900 Chemed Center
255 East Fifth Street
Cincinnati, OH 45202
(513) 977-8200
Attorneys for Defendant, The Procter &
Gamble Company, et al.

1


EXHIBIT
A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| RAUL M. ESPITIA, | : | Case No. C-1-00-531 |
| | : | |
| Plaintiff, | : | Judge Herman J. Weber |
| | : | |
| v. | : | |
| | : | **MEMORANDUM IN SUPPORT OF** |
| THE PROCTER & GAMBLE | : | **DEFENDANT THE PROCTER &** |
| COMPANY, et al., | : | **GAMBLE COMPANY'S MOTION FOR** |
| | : | **SUMMARY JUDGMENT** |
| Defendants. | : | |

## STATEMENT OF POINTS AND AUTHORITIES

**Page(s)**

I.  FACTS ............................................................................. 5

    A.  Introduction ........................................................... 5

    B.  Plaintiff's Falsification of His Time Sheet Concerning
        July 8, 1999 ............................................................ 7

    C.  P&G Policies Prohibiting Falsification ............................ 10

    D.  P&G's Decision To Terminate Plaintiff ............................ 12

    E.  The Grievance Filed With Respect To Plaintiff's
        Termination ........................................................ 14

II. LAW AND ARGUMENT ....................................................... 16

    A.  Summary Judgment Should Be Granted In This Case
        Under The "New Era" Summary Judgment Standard
        Because Plaintiff Failed To Present Facts Sufficient To
        Reach A Jury ........................................................ 16

        _Authorities:_

        Street v. J.C. Bradford & Co., 886 F.2d 1472 (6th Cir. 1989)  16

        Celotex Corp. v. Catrett, 477 U.S. 317 (1986) .................. 16

Allen v. Diebold, Inc., 33 F.2d 674 (6th Cir. 1994) .......... 17

Gagne v. Northwestern National Ins. Co., 881 F.2d 309
(6th Cir. 1989) ……………………………………………….. 17,18

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) …... 17

Betkerur v. Aultman Hospital Ass'n, 78 F.3d 1079
(6th Cir. 1996) …………………………………………………. 17

Mitchell v. Toledo Hospital, 964 F.2d 577 (6th Cir. 1992) .. 17

Hartsel v. Keys, 87 F.3d 795 (6th Cir. 1996) ………………. 18

Simpson v. Midland-Ross Corp., 823 F.2d 937
(6th Cir. 1987) …………………………………………………. 18

Wathen v. General Electric Co., 115 F.3d 400
(6th Cir. 1997) …………………………………………………. 18

Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796
(6th Cir. 1994) …………………………………………………. 18

Wilson v. Stroh Companies, Inc., 952 F.2d 942
(6th Cir. 1992) …………………………………………………. 18

B.    Summary Judgment Must Be Granted To Defendant On
Plaintiff's Discrimination Claims ……………………………. 18

    1.    Plaintiff cannot produce evidence of national
origin or race discrimination under federal law. …….. 18

*Authorities:*

42 U.S.C. § 2000e-2(a)(1) ……………………………. 18

St. Mary's Honor Center v. Hicks, 509 U.S. 502,
113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) …………… 18,19

Mitchell v. Toledo Hospital, 964 F.2d 577
(6th Cir. 1992) …………………………………………. 19

Reeves v. Sanderson Plumbing Prods., Inc.,
530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105
(2000) …………………………………………………… 19

Manzer v. Diamond Shamrock Chems. Co.,
29 F.3d 1078 (6th Cir. 1994) ............................    19

    a.    Plaintiff cannot set forth a prima facie
case of discrimination ............................    19

        *Authorities:*

Ercegovich v. Goodyear Tire & Rubber Co.,
154 F.3d 344 (6th Cir. 1998) ..................    20

Mitchell v. Toledo Hospital, 964 F.2d 577
(6th Cir. 1992) .....................................    20

    b.    Plaintiff cannot prove that the reasons
proffered by P&G for his discharge were
pretextual for unlawful discrimination .........    20

        *Authorities:*

Woythal v. TexTenn Corp., 112 F.3d 243
(6th Cir. 1997) .....................................    20

St. Mary's Honor Center v. Hicks,
509 U.S. 502, 113 S.Ct. 2742,
125 L.Ed.2d 407 (1993) .......................    20

Smith v. Leggett Wire Co., 220 F.3d 752
(6th Cir. 2000) .....................................    21,24

Manzer v. Diamond Shamrock Chem. Co.,
29 F.3d 1078 (6th Cir. 1994) ..................    21

Smith v. Chrysler, 155 F.3d 799 (6th Cir.
1998) ................................................    21

    2.    Plaintiff cannot prove state law national origin
or race discrimination ....................................    24

        *Authorities:*

Little Forest Medical Center of Akron v. Ohio
Civil Rights Commission, 61 Ohio St.3d 607,
575 N.E.2d 1164 (1991) ................................    24

C.    Defendant Must Be Granted Summary Judgment On
Plaintiff's "Public Policy" Claim ................................    24

*Authorities:*

Sadinsky v. EBCO Mfg. Co., 134 Ohio App.3d 54,
730 N.E.2d 400 (1999) ……………………………………    24

Cochran v. Columbia Gas of Ohio, Inc., 138 Ohio
App.3d 888, 741 N.E.2d 734 (2000) …………………    24

III.    CONCLUSION ……………………………………………    25

CERTIFICATE OF SERVICE …………………………………    25

I.   **FACTS**

A.   **Introduction**

This action was brought by Plaintiff Raul Espitia ("Plaintiff") against Defendants The Procter & Gamble Company ("P&G") and the Employee Representation Association ("ERA") on June 29, 2000. Plaintiff sets forth a seven Count complaint as follows:

- Count I – Breach of Duty of Fair Representation Against Defendant Union Employee Representation Association;

- Count II - Breach of Duty of Fair Representation Against Defendant Union Under Section 9(a) of the NLRA;

- Count III – Title VII – National Origin Discrimination;

- Count IV – Title VII Race Discrimination,

- Count V – O.R.C. Section 4112 – State Race Discrimination;

- Count VI - O.R.C. Section 4112 – National Origin Discrimination;

- Count VII – Public Policy Tort.

Accordingly, as against Defendant P&G, Plaintiff alleges only national origin and race discrimination pursuant to state and federal law and a public policy tort. Plaintiff further alleges in Counts I and II a breach of duty of fair representation, but only against Defendant ERA.

P&G is a manufacturer and distributor of household products. The ERA is a union which represents some of P&G's employees. Plaintiff is a former employee of Defendant P&G and a former member of the ERA.

Plaintiff began working for P&G's Modesto, California plant in 1986. (Espitia depo., p. 55).[1] In February of 1994, Plaintiff transferred to the Combo Packing Department of P&G's Beauty Care Business. (Espitia depo., p. 57; see also, Lancor depo., p. 11). He worked at P&G's Beauty Care Plant, which is located at the Ivorydale facility, in Cincinnati, Ohio. (Espitia depo., p. 57, see also Lancor depo., p. 11-12).

In July, 1999, Plaintiff's first line manager was department leader Patrick Tewksbury ("Mr. Tewksbury"). (Tewksbury depo., p. 13). Mr. Tewksbury had only been Plaintiff's manager for approximately two months at that time, and he had not yet had the opportunity to formally evaluate Plaintiff. (Tewksbury depo., pp. 6, 24-25). However, Mr. Tewksbury was aware of several issues with respect to Plaintiff's performance as a technician. (Tewksbury depo., p. 26). First, Mr. Tewksbury was aware of an issue with Plaintiff's compliance with the "run to target" system. (Tewksbury depo., p. 26). Pursuant to this system, technicians were required to perform checks to measure and inspect the equipment and how it is set up. (Tewksbury depo., p. 26-27). Such checks are supposed to be performed on a per shift basis. (Tewksbury depo., p. 28). Plaintiff was not completing the checks regularly. (Tewksbury depo., p. 28).

Another performance issue about which Mr. Tewksbury was aware with respect to Plaintiff was an incident which occurred around July, 1999. (Tewksbury depo., p. 35). A piece of equipment was down for an excessive period of time. (Tewksbury depo., p. 35). In this instance, a knife needed to be replaced on a bundler machine. (Tewksbury

---

[1] All pages cited from the deposition of Plaintiff Paul Espitia are attached hereto as Exhibit A. The remaining depositions cited are attached as follows: Exhibit B - Barbara Lancor; Exhibit C - Patrick Tewksbury; Exhibit D - Ray Maynard; Exhibit E - Tonya King; Exhibit F - Joe Beer; Exhibit G - Mary O'Rourke; Exhibit H - Tom Winters; Exhibit I - Mike Lindsey; Exhibit J - Kim Zimmer; Exhibit K - Steve Lighthall; Exhibit L - Dwain Carver; Exhibit M - Tom Brown; and Exhibit N - Jeff Drago.

depo., p. 36). Mr. Tewksbury felt that Plaintiff was being untruthful in his dealings with Mr. Tewksbury, as Plaintiff had expertise on the bundler machines and yet disclaimed knowledge with respect to them. (Tewksbury depo., p. 36).

### B.    Plaintiff's Falsification of His Time Sheet Concerning July 8, 1999

On Thursday, July 8, 1999, Plaintiff was scheduled to work 6:30 a.m. to 7:00 p.m. (Espitia depo., p. 150). He arrived to work at 6:30 a.m., then left the plant at approximately 8:00 a.m. (Espitia depo., p. 151).[2] It is undisputed that Plaintiff did not arrange for his absence prior to July 8, 1999 and he did not notify any manager that he was leaving. (Espitia depo., pp. 151, 152). While he was absent, Mr. Tewksbury learned that Plaintiff was away from the plant because other employees were working overtime to cover the absence. (Tewksbury depo., p. 47-50; Maynard depo., p. 27). Upon learning that Plaintiff had left the plant, Mr. Tewksbury checked Plaintiff's time sheet to see if and how Plaintiff had accounted for his absence. (Tewksbury depo., p. 51; Exh. 2).

In 1999, time sheets were hand-completed by the employees, and comprised a one week period. (See Tewksbury depo., Exh 1, second page; King depo., p. 25). Employees were paid based upon the data entered on the time sheet. (King depo., pp. 48-49). The sheets recorded start and end times, and also actual number of hours worked, for each day worked. (See Tewksbury depo., Exh. 1, second page). Plaintiff's schedule for the week of July 8, 1999, week called for him to work Monday, July 5, Thursday, July 8 (the day in question) and Friday, July 9. (See Tewksbury depo., Exh 1, second page).

---

[2]  Plaintiff testified that he left the plant in order to attend a court hearing with his brother. (Espitia depo., p. 155). Defendant does not dispute the claim. However, the reasons for Mr. Espitia's absence are immaterial in this matter.

When Mr. Tewksbury examined Plaintiff's time sheet, it is undisputed that he observed Plaintiff had already completed his time for Monday, July 5, 1999. (Tewksbury depo., p. 51, Exh. 2)  The time sheet indicated Plaintiff had worked 6:30 p.m. to 7:00 a.m.[3], and a total of twelve hours, on Monday, July 5.  Id.  The time sheet also indicated Plaintiff had worked 6:30 a.m. to 7:00 p.m., and a total of twelve hours, on Friday, July 9 (though Mr. Tewksbury was examining the sheet on Thursday, July 8). Id.  However, for Thursday, July 8, Mr. Tewksbury observed that the time sheet was completed with only a 6:30 a.m. start time.  (Tewksbury depo., p. 51, Exh. 2).

Plaintiff returned to the plant on July 8, 1999, at approximately 11:00 a.m. (Espitia depo., p. 151).  The following day, Friday, July 9, 1999, at approximately 5:30 p.m., Mr. Tewksbury again checked Plaintiff's time sheet.  (Tewksbury depo., p. 51, 52, Exh. 2).  It is undisputed that he then observed that the time sheet for July 8 was fully completed, with a 7:00 p.m. end time and a total twelve hours added to the entry for Thursday, July 8.  Id.  Nowhere on the time sheet did Plaintiff indicate that he had been absent for any number of hours on Thursday, July 8, 1999.  (See Tewksbury depo., Exh. 1, second page).  Tewksbury knew that the information on the time sheet for Plaintiff with respect to July 8 was false because Plaintiff, in fact, had not worked twelve hours since he had left the plant between 8 a.m. and 11 a.m.  (Espitia depo., p. 151; Tewksbury depo., pp. 50-52).

On the following Tuesday morning, July 13, 1999, which was the next day Plaintiff was scheduled to work, Mr. Tewksbury conducted a fact-finding meeting with

---

[3] Apparently, Plaintiff actually worked 6:30 a.m. to 7:00 p.m. on Monday, July 5, and inaccurately completed the sheet to report he had worked 6:30 p.m. to 7:00 a.m.  (Espitia depo., p. 173).  However, that error is not an issue in this case.

8

regard to the event, and the false information on Plaintiff's time sheet. [4] (Tewksbury depo., p. 48). Mr. Tewksbury set up a meeting with another manager, Joe Beer[5], a union steward, Jim Scarcella, and Plaintiff. (Beer depo., p. 17; Tewksbury depo., pp. 48-50). At the fact-finding meeting, Mr. Tewksbury, Mr. Beer and Mr. Scarcella showed Plaintiff the time sheet and asked him what he had filled out on it. (Tewksbury depo., p. 50). Plaintiff initially advised that he had filled out **both** the start and end times (not the hours worked) for the **entire** week (including Thursday) **at the beginning of the week**. (Tewksbury depo., p. 50). This claim obviously contradicted Mr. Tewksbury's firsthand observations, in that when Mr. Tewksbury observed Plaintiff's time sheet during Plaintiff's absence on the morning of July 8, 1999, he observed a start time, but not an end time, completed for Thursday, July 8. (Tewksbury depo., p. 51, Exh. 2). Plaintiff then stated that he had not filled in the "12" (representing twelve hours worked) in the block for Thursday, July 8, 1999 (Tewksbury depo., p. 50), and stated that the "2" in the "12" was not his handwriting; Plaintiff claimed that he "always" makes his "2's" with open loops. (Espitia depo., p. 109). Plaintiff advised Mr. Tewksbury that he thought Tonya King, the payroll clerk, might have filled in the "12" for him concerning the July 8, 1999 entry on the time sheet. (Tewksbury depo., p. 50). Plaintiff was suspended with pay pending further investigation. (Tewksbury depo., p. 68).

Mr. Tewksbury then conducted a fact-finding meeting with Tonya King, the payroll clerk. (Tewksbury depo., p. 68, Exh. 1; King depo., p. 61). Union representation was present. (Tewksbury depo., p. 69). Ms. King was asked specifically if she filled anything out on the time sheet. (Tewksbury depo., p. 68, Exh. 1; King depo., p. 61).

---

[4]  Fact-finding is a process P&G uses to gather data. (Tewksbury depo., p. 45).
[5]  Per P&G policy, a second manager is included in fact-finding meetings to take notes, and in order "to help make sure that you truly get all the facts out in case of any clarity concerns." (Beer depo., p. 12).

She advised that she had, and identified all portions of the time sheet which reflect what she had filled out. (Tewksbury depo., p. 68, Exh. 1). No changes had been made to Plaintiff's time. Id. In fact, Ms. King stated that no one called her to have their time filled in or corrected. Id. It is undisputed that Ms. King reported that she did not fill in the "12" for Plaintiff with respect to Plaintiff's July 8, 1999 time sheet, and she did not fill out any portion of the time sheet with respect to the hours Plaintiff worked.

Further, as part of the investigation, the department pulled a sampling of Plaintiff's previous time sheets. (Lancor depo., p. 43) The sheets were examined to look for similarities between the Plaintiff's earlier sheets from previous weeks and the time sheet in question. (Espitia depo., p. 220, Exh. 12; Lancor depo., p. 43). It is undisputed that prior time sheets showed that Plaintiff sometimes made his "2's" with line at the bottom instead of an open loop. (Espitia depo., Exh. 12).

As a result of the fact-finding, Plaintiff's manager, Mr. Tewksbury concluded that Plaintiff had intentionally falsified his time sheet, by reporting that he had worked twelve hours on July 8 when, in fact, he did not, and Plaintiff "intended to, for lack of a better word, steal from the company and mislead the company by saying what he did not do." (Tewksbury depo., p. 118-119).

### C.    P&G Policies Prohibiting Falsification

P&G's expectations of its employees with respect to falsification were clear at the time of Plaintiff's termination. Plaintiff acknowledged receipt of "You and P&G," Defendant P&G's employee handbook. (Espitia depo., p. 143; Exh. 9). The handbook contains a section on company records. (Espitia depo., p. 144; Exh. 9). The section states, in part:

> Never falsify any Company records or misuse a company Plan or benefit. Never knowingly give false information in the conduct of Company business.

(Espitia depo., p. 144-145; Exh. 9).

Further, it is undisputed that P&G regularly had placed postings on employee bulletin boards to emphasize the seriousness of falsification. Specifically, these postings advised employees:

> Never falsify any Company records or documents or misuse a Company Plan or Benefit. Never knowingly give false information in the conduct of Company business. . . Accuracy by day, each day in reporting your hours on the time sheet is essential.

(Espitia depo., p. 118, Exh. 7). Further:

> **If it is ever determined that someone intended to defraud or mislead the Company, for example by falsifying a payroll record, buying requisition, or any other Company document, disciplinary action may include termination, even though it may be a first offense.**

(Espitia depo., p. 134, Exh. 7). Plaintiff testified that he understood this language. (Espitia depo., p. 145). Further, in January, 1999, a letter was jointly drafted by P&G management and the leadership of the ERA. (O'Rourke depo., p. 14). In this letter, P&G and the ERA re-clarified employee expectations with respect to falsification. Id.

Plaintiff himself acknowledges that his time records were supposed to be true and accurate, and that employees were not to cheat the company when completing their time records. (Espitia depo., p. 115-116). He agrees that if an employee submitted a time sheet which reflected more hours than he actually worked, and the employee was paid for those hours, such act, if uncorrected, would constitute stealing from the Company. (Espitia depo., p. 135). Plaintiff further acknowledges that, as an ERA member, he received and was subject to the "Working Agreement Between

11

Employee's Representation Association and The Procter & Gamble Company." (Espitia depo., pp. 111-112, Exh. 5). Pursuant to Article IX of the agreement, "Employees who do not observe the Employer's rules are subject to discharge." (Espitia depo., p. 113, Exh. 6).

### D.     P&G's Decision To Terminate Plaintiff

Mr. Tewksbury reviewed the fact-finding results with Human Resources Manager Barbara Lancor[6] and Beauty Care Plant Manager Mary O'Rourke.[7] (O'Rourke depo., p. 19). As Beauty Care Plant Manager, Ms. O'Rourke was responsible for making all final termination decisions with respect to employees in the Beauty Care Plant. (O'Rourke depo., pp. 8, 18). As Human Resources Manager, Ms. Lancor testified that her role was to work with the managers to ensure that the proper procedures were followed.[8] (Lancor depo., p. 33).

Ms. O'Rourke asked Plaintiff's manager, Mr. Tewksbury, for a recommendation of discipline, which is her standard policy. (O'Rourke depo., pp. 20-21). Mr. Tewksbury recommended termination "based on the fact that (Plaintiff) had falsified company records with intent to benefit himself, and that that was a clear violation of company policies and rules, which we have reviewed regularly and have included bulletin notices, et cetera." (O'Rourke depo., p. 21, 27). Ms. O'Rourke took Mr. Tewksbury's recommendation under advisement. (O'Rourke depo., p. 27).

Thereafter, a second meeting was held regarding Plaintiff. (O'Rourke depo., p. 27). Individuals present at the second meeting included Mr. Tewksbury, Ms.

---

[6]  Ms. Lancor was the Human Resources Manager for Beauty Care at the time of Plaintiff's termination. (Lancor depo., p. 9).
[7]  Ms. O'Rourke assumed the position of Beauty Care Plant Manager on August 1, 1998. (O'Rourke depo., p. 8).

O'Rourke, Ms. Lancor and union representative Jim Scarcella.  (O'Rourke depo., pp. 27-28).  The fact-finding results were again reviewed. (O'Rourke depo., p. 28).  Mr. Scarcella requested leniency towards the Plaintiff. (O'Rourke depo., p. 28).  Mr. Tewksbury again recommended termination. (Tewksbury depo., p. 70; O'Rourke depo., p. 28). Ms. Lancor concurred, as the "facts of the case indicated that . . . (Plaintiff) had intended to steal from the company. . . **we concluded that he had completed the time sheets**." (Lancor depo., p. 46, emphasis added).  Further, it is undisputed that:

> Falsifying time cards with intent to steal from the company is a very serious infraction that we communicate to all our employees that there are some things that are just so serious that they can expect to be terminated.

(Lancor depo., p. 45).

After these meetings, Ms. O'Rourke concluded that Plaintiff had falsified his time sheet in violation of Company rules and that Plaintiff's employment with P&G would be terminated as result of his misconduct. (O'Rourke depo., p. 30-31; Lancor depo., p. 39). Plaintiff was subsequently terminated in a meeting that took place on July 27, 1999. (Tewksbury depo., p. 82). Plaintiff, Mr. Tewksbury, Mr. Tom Winters[9] and Curt Salyers, ERA Vice President were present for the meeting.  (Tewksbury depo. p. 82).  Mr. Winters took notes and handled the benefits transition discussion.  (Winters depo., p. 21).

Mr. Michael Lindsey was the Associate Director for Human Resources for the Ivorydale complex at the time of Plaintiff's termination. (Lindsey depo., p. 8).  As such,

---

[8]  Specifically, Ms. Lancor would inquire as to the managers what procedures were followed, whether fact-finding was conducted, and whether there was union involvement in the fact-finding. (Lancor depo., p. 33).
[9]  Mr. Winters was the Combo Operations Manager, and Mr. Tewksbury's immediate supervisor at the time of Plaintiff's termination. (Winters depo., pp. 8, 11).

he was also involved in the investigation surrounding Plaintiff's time sheet falsification.[10]

(Lindsey depo., p. 16).   Mr. Lindsey's role was to "make sure that fact finding was

completed, was accurate, all facts came out, and that management had the right

information in order to come up with the conclusion, and then to implement the decision

necessary."  (Lindsey depo., p. 17).   With respect to the investigation surrounding

Plaintiff's termination, Mr. Lindsey testified:

> The investigation included fact finding by the line managers of the
> incident.  And people that had pertinent information around the incident
> were interviewed, the facts were assembled and provided to management.
> **Management made a conclusion based upon the evidence and,**
> **considering the evidence, concluded that (Plaintiff) had falsified his**
> **time sheet**.
>
> I think is probably important to note that falsification has two criteria that
> have to be met. . . there has to be intent from the employee to falsify the
> document, we have to conclude that there was an intent; and the other is
> that it had to be for personal gain or some kind of gain for themselves.
>
> That conclusion was met, the criteria was met, and given that, as an
> immediately-terminable offense even on a first offense, management
> decided to terminate Mr. Espitia.

(Lindsey depo., pp. 20-21, emphasis added).

### E.    The Grievance Filed With Respect To Plaintiff's Termination

After Plaintiff's termination, the ERA filed a grievance on his behalf.  (Zimmer

depo., p. 27, Exh.1).  The grievance process is three-fold.  The first step is the "problem

resolution step" done with the immediate manager. (Lancor depo., p. 22).  There is no

formal response at this step. (Lancor depo., p. 51).  The second step is the "department

step" where the grievance is presented to the department head.  <u>Id</u>.  The third step is

the "plant step," where the grievance is taken to the plant leader.  <u>Id</u>.  In the case of

---

[10] As the site H.R. Manager, Mr. Lindsay became involved in the investigations regarding any potential
major employee discipline.  (Lindsey depo., p. 16).

termination, the first step is bypassed and the grievance is presented initially at the second step. (Lighthall depo., pp. 13-14).

At the second step, the grievance was presented to Kim Zimmer,[11] Combo Operations Leader, by Tom Brown, union steward. (Zimmer depo., p. 18). Ms. Zimmer asked Mr. Brown for Plaintiff's "side of the issue." (Zimmer depo., p. 18). She also spoke with Mr. Tewksbury to gain an understanding of the "company side." (Zimmer depo., p. 24). In meeting with Mr. Tewksbury, Ms. Zimmer asked him what he had done to investigate the falsification, and what he had found. (Zimmer depo., p. 32). She also reviewed fact-finding notes from the investigation. (Zimmer depo., pp. 33-35). At the conclusion of her investigation, Ms. Zimmer prepared a response denying the grievance (Zimmer depo., p. 38, Exh. 3). She met with Mr. Brown, Union Steward, to share her response. (Zimmer depo., p. 41).

The ERA processed the grievance to the next step of the grievance procedure. Mr. Dwain Carver replaced Mary O'Rourke as the Beauty Care Business Leader on November 1, 1999. (Carver depo., pp. 7, 9). As such, he was responsible for responding to Plaintiff's grievance at the Step 3 plant level. (Carver depo., pp.12-14). When Mr. Carver received the grievance, he initiated a new and independent investigation into Plaintiff's termination. (Carver depo., p. 14; Lindsey depo., p. 59). The investigation consisted of independent interviews. Id. Mr. Carver also asked the ERA suggestions as to who he should interview regarding the termination. Id. Mr. Carver recalls conducting independent interviews with Tom Brown, Jeff Drago, Ray Maynard, Tonya King and Pat Tewksbury. Id. Mr. Carver also reviewed the Plaintiff's

---

[11] Ms. Zimmer was Combo Operations Leader and Mr. Tewksbury's supervisor at the time she responded to Plaintiff's grievance. (Zimmer depo., p. 13). However, she did not assume that position until after Plaintiff's termination. (Zimmer depo., p. 14).

personnel file and the Plaintiff's past time sheets. (Carver depo., pp. 15, 26-27). After conducting his investigation, Mr. Carver also concluded that Plaintiff had indeed intentionally falsified his time sheet. (Carver depo., p. 37). Accordingly, he concurred in the Company's prior decision to terminate the Plaintiff, and, on December 15, 1999, denied Plaintiff's grievance. (Carver depo., p. 37; Carver depo., Exh. 2). The ERA ultimately decided not to process the grievance to arbitration, because "the time sheet was overwhelming evidence against (Plaintiff) . . . one-time falsification can get you terminated. (Brown depo., pp. 49-50).

## II.    LAW AND ARGUMENT

Summary judgment must be granted to P&G on all claims asserted against it, as even after taking **seventeen** separate depositions, Plaintiff cannot meet his burden of proving that P&G discriminated against him because of his national origin or race in deciding to terminate him.

### A.    Summary Judgment Should Be Granted In This Case Under The "New Era" Summary Judgment Standard Because Plaintiff Failed To Present Facts Sufficient To Reach A Jury.

The Supreme Court has encouraged the disposal of cases by summary judgment by developing "new era" summary judgment principles. Street v. J.C. Bradford & Co., 886 F.2d 1472, 1476 (6th Cir. 1989). A Rule 56 motion requires the party opposing summary judgment to "put up or shut up." Id. at 1478. In Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986), the Supreme Court held that summary judgment must be entered for the defendant when:

> [A] party [plaintiff] fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's

case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*See also,* Allen v. Diebold, Inc., 33 F.2d 674 (6th Cir. 1994); Gagne v. Northwestern

National Ins. Co., 881 F.2d 309, 312 (6th Cir. 1989).

To avoid summary judgment, a plaintiff must produce "specific facts" sufficient to

permit the court to find in her favor on each essential element of her case. Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). In Anderson, the Supreme Court noted

that:

> **Nor are judges any longer required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party.** Formerly, it was held that if there was what is called a *scintilla* of evidence in support of a case, the judge was bound to leave it to the jury, but recent decisions of high authority have established a more reasonable rule, that in every case, before the evidence is left to the jury, **there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.**

Id. at 251 (emphasis added). Mere speculation, supposition or conclusory belief is

insufficient as a matter of law to raise a genuine issue barring summary judgment.

Betkerur v. Aultman Hospital Ass'n, 78 F.3d 1079, 1096 (6th Cir. 1996) (affirming

summary judgment for defendant employer because plaintiff's deposition testimony

challenging defendant's proffered reasons for its actions consisted of "nothing more

than rumors, conclusory allegations and subjective beliefs which are wholly insufficient

evidence to establish a claim of discrimination as a matter of law."); Mitchell v. Toledo

Hospital, 964 F.2d 577, 582, 585 (6th Cir. 1992) (same; also noting that "[t]he 'mere possibility' of a factual dispute is not enough" to block summary judgment); Hartsel v. Keys, 87 F.3d 795, 802 (6th Cir. 1996) ("Since [the plaintiff's opposition] is based solely on speculation and hunches, the Plaintiff has not created a *genuine* issue of *material* fact sufficient to prevent summary judgment.") (emphasis in original); Simpson v. Midland-Ross Corp., 823 F.2d 937, 941 (6th Cir. 1987).

Following the "new era" summary judgment principles, the Sixth Circuit has routinely affirmed the granting of summary judgment in employment discrimination cases. *See, e.g.,* Wathen v. General Electric Co., 115 F.3d 400 (6th Cir. 1997); Betkurer, *supra,* 78 F.3d at 1087-88; Hartsel, *supra,* 87 F.3d 795; Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 800 (6th Cir. 1994); Wilson v. Stroh Companies, Inc., 952 F.2d 942, 945-46 (6th Cir. 1992); Gagne, *supra,* 881 F.2d 309 (6th Cir. 1989).

**B.   Summary Judgment Must Be Granted To Defendant On Plaintiff's Discrimination Claims.**

### 1.   *Plaintiff cannot produce evidence of nation origin or race discrimination under federal law.*

Title VII makes it unlawful for an employer to discriminate against an employee because of the employee's national origin or race. 42 U.S.C. § 2000e-2(a)(1).  Proof of intentional discrimination is required under a disparate treatment analysis. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).  To establish a prima facie case of race or national origin discrimination, a plaintiff must show that he (1) was a member of a protected class, (2) was qualified for the position, (3) was discharged, and (4) was replaced by a person outside the protected group, or was treated less favorably than similarly situated employees outside the protected

class. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); Mitchell v. Toledo Hospital, 964 F.2d 577, 582 (6th Cir. 1992). Once a prima facie showing is made, the burden of production shifts to the defendant to articulate a legitimate non-discriminatory reason for its decision. The ultimate burden of persuasion rests with the plaintiff to prove that the proffered reasons were a pretext for discrimination. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir.1994).

> **a)    Plaintiff cannot set forth a prima facie case of discrimination.**

Plaintiff has not set forth a prima face case of discrimination, as Plaintiff can neither prove that he was replaced by a individual who was not in a protected class, nor can he prove that similarly situated employees outside the protected class were treated more favorably.

First, Plaintiff has not produced evidence that Plaintiff was replaced by an individual outside the protected class. While there was some testimony that a "Michael Manley", an existing plant employee, eventually went to Plaintiff's team months after Plaintiff's termination, there has been no evidence produced that Mr. Manley "replaced" Plaintiff. (Tewksbury depo., p. 41-42; Drago depo., pp. 18-22). To the contrary, the uncontroverted evidence indicates that Plaintiff's position was covered by overtime and "float people." (Id.).

Further, Plaintiff cannot show that he was treated differently from similarly situated individuals who were of a different race or national origin. To be similarly situated, "the individuals with whom the Plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards

and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998), quoting Mitchell v. Toledo Hospital, 964 F.2d 577, 583 (6th Cir. 1992). Plaintiff can produce no evidence of other employees who were supervised by Mr. Tewksbury, intentionally falsified time sheets, and were not recommended for termination by Mr. Tewksbury. Similarly, Plaintiff can produce no evidence of employees in the Beauty Care Plant, during Ms. O'Rourke's tenure as Plant Manager, who intentionally falsified time sheets and were not terminated by Ms. O'Rourke.

> **b)    Plaintiff cannot prove that the reasons proffered by P&G for his discharge were pretextual for unlawful discrimination.**

Even assuming, arguendo, that Plaintiff has set forth a prima facie case of race discrimination, his claim still fails as a matter of law. P&G has set forth a legitimate, nondiscriminatory reason for Plaintiff's termination – his falsification of Company time records in violation of Company rules for which termination is the prescribed penalty, even for a first offense. Plaintiff cannot meet his burden of proving that this justification is pretextual for unlawful discrimination. In order to do so, plaintiff must produce sufficient evidence from which the jury could "reasonably reject [the defendants'] explanation" and infer that the defendants "intentionally discriminated" against him. See Woythal v. TexTenn Corp., 112 F.3d 243, 246-47 (6th Cir. 1997) (citing St. Mary's Honor Center, 509 U.S. at 519, 113 S.Ct. 2742).

A plaintiff may demonstrate that the defendant's explanation was merely pretext by showing (1) that the proffered reason had no basis in fact, (2) that the proffered reason did not actually motivate the termination, or (3) that the proffered reason was not

sufficient to motivate the discharge. Smith v. Leggett Wire Co., 220 F.3d 752, 759 (6th

Cir. 2000), citing Manzer v. Diamond Shamrock Chem. Co., 29 F.3d 1078, 1092 (6th

Cir. 1994). However, pursuant to the "honest belief" rule, an employer's proffered

nondiscriminatory basis for its adverse employment action cannot be pretext for

discrimination where, as here, it is uncontroverted that it is honestly held. See Smith v.

Chrysler, 155 F.3d 799, 806-07 (6th Cir.1998).

In order to determine whether the defendant had an "honest belief" in the

proffered basis for the adverse employment action, the Sixth Circuit looks to whether

the employer can establish its "reasonable reliance" on the particularized facts that were

before it at the time the decision was made. See Smith, 155 F.3d at 807. Further:

> In deciding whether an employer reasonably relied on the
> particularized facts then before it, we do not require that the
> decisional process used by the employer be optimal or that it
> left no stone unturned. Rather, the key inquiry is whether the
> employer made a reasonably informed and considered
> decision before taking an adverse employment action.

Id. Once the defendant has satisfied its burden to establish "reasonable reliance" on

particularized facts, the plaintiff must allege more than a dispute over the facts upon

which his discharge was based. He must put forth evidence which demonstrates that

the employer did not "honestly believe" in the proffered non-discriminatory reason for its

adverse employment action. See Smith v. Chrysler, 155 F.3d 799, 806-07 (6th

Cir.1998).

There can be no legitimate dispute that the Company reasonably relied on the

particularized facts before it in determining that Plaintiff falsified his time sheets. On

Thursday, July 8, 1999, when Plaintiff was absent from work, it is uncontroverted that

his supervisor, Patrick Tewksbury observed that Plaintiff had already completed his time

sheet, with both start and stop times, and total hours worked, for Monday, July 5, 1999

21

and Friday, July 9, 1999 (Tewksbury depo., p. 51, Exh.2). However, for Thursday, July 8, Mr. Tewksbury observed that the time sheet was completed with only a 6:30 a.m. start time. (Tewksbury depo., p. 51, Exh. 2). The following day, Mr. Tewksbury again checked Plaintiff's time sheet. (Tewksbury depo., p. 51, Exh. 2). He then observed that the time sheet was fully completed, with a 7:00 p.m. end time and a total twelve hours added to the entry for Thursday, July 8. Id.

Pursuant to P&G policy, Mr. Tewksbury conducted a fact-finding meeting with Plaintiff, a second manager and a union representative. During the fact-finding, Plaintiff advised that he had filled out the start and end times (not the hours worked) for the **entire** week (including Thursday) **at the beginning of the week**. (Tewksbury depo., p. 50). This claim obviously contradicted Mr. Tewksbury's uncontroverted firsthand observations, in that Mr. Tewksbury observed a start time, but not an end time, completed for Thursday, July 8. Mr. Espitia further claimed that Tonya King, the payroll clerk, must have filled out the time. (Tewksbury depo., p. 68, Exh. 1).

Despite the fact that Plaintiff's claims contradicted Mr. Tewksbury's personal observations, Mr. Tewksbury then conducted a fact-finding meeting with Tonya King, the payroll clerk. (Tewksbury depo., p. 68, Exh. 1). Ms. King advised that she had not made any changes to Plaintiff's time sheet or filled in any of Plaintiff's time sheet with respect to the hours he purportedly worked. Id. Further, Mr. Tewksbury went to plant security to obtain information as to when Plaintiff left and returned. (Espitia depo., p. 6).

Finally, in order to ascertain the validity of Plaintiff's claim that the "12" in the block was not his handwriting because he did not make his "2's" with a straight line at the bottom, the department pulled a sampling of Plaintiff's previous time sheets. (Lancor depo., p. 43). Plaintiff's prior time sheets were examined to look for similarities

between the earlier sheets and the time sheet in question. (Lancor depo., p. 43). That examination established that despite Plaintiff's bare denial during the investigation, twos were written on Plaintiff's time sheets for prior weeks in the same exact fashion that Plaintiff claimed he did not make his twos. Both the human resources manager for the Beauty Care Plant, and the Associate Director for Human Resources of Ivorydale, were involved in overseeing the investigation into Plaintiff's misconduct to make sure proper processes were followed. (Lancor depo., p. 33; Lindsey depo., p. 17). Based upon these particularized facts, Defendant made the reasonable determination that Plaintiff had, in fact, falsified his time sheet for July 8, 1999.

Further, there is not a shred of evidence that Defendant did not honestly conclude the Plaintiff committed the infraction - time sheet falsification – for which he was terminated. To the contrary, the uncontradicted record establishes that Defendant's managers concluded that Plaintiff did intentionally falsify his time sheet. (See deposition of Plaintiff's supervisor, Patrick Tewksbury, pp. 118-119, concluding that that Plaintiff had intentionally falsified his time sheet, and "he intended to, for lack of a better word, steal from the company and mislead the company by saying what he did not do;" deposition of Barbara Lancor, p. 46, stating, the "facts of the case indicated that . . . (Plaintiff) had intended to steal from the company. . . we concluded that he had completed the time sheets;" deposition of Michael Lindsey, pp. 20-21, stating "Management made a conclusion based upon the evidence and, considering the evidence, concluded that (Plaintiff) had falsified his time sheet . . .").

In any event, Plaintiff cannot prove pretext. Plaintiff has adduced absolutely no evidence that Defendant's proffered explanation for his termination (1) had no basis in

fact, (2) did not actually motivate Plaintiff's termination, or (3) was not sufficient to motivate the discharge. See Smith v. Leggett Wire Co., supra, 220 F.3d at 759.

As Plaintiff cannot prove that Defendant's reason for Plaintiff's termination was pretextual for unlawful discrimination, Defendant must be granted summary judgment on the issue of federal race discrimination.

### 2. *Plaintiff cannot prove state law national origin or race discrimination.*

The elements and legal standards for establishing unlawful discrimination are the same under Ohio and federal law. Little Forest Medical Center of Akron v. Ohio Civil Right Commission, 61 Ohio St.3d 607, 609-610, 575 N.E.2d 1164, 1167 (1991). Accordingly, to the extent that Plaintiff's federal national origin and discrimination claims fail (and Defendant argues they does), Defendant must also be granted summary judgment on Plaintiff's state national origin and race discrimination claim

### C. Defendant Must Be Granted Summary Judgment On Plaintiff's "Public Policy" Claim.

As Plaintiff cannot prove that he was discriminated against based upon his race or national origin, he cannot prove that Defendant violated the public policy of the state of Ohio. See Sadinsky v. EBCO Mfg. Co., 134 Ohio App.3d 54, 62, 730 N.E.2d 400 (1999) (Because appellant failed to make a prima facie case of disability discrimination, his argument that his discharge violated public policy also fails); see also Cochran v. Columbia Gas of Ohio, Inc., 138 Ohio App.3d 888, 895, 741 N.E.2d 734, 739 (2000) (where Plaintiff cannot prove discrimination or unequal pay, Plaintiff cannot prove a public policy violation based upon same). Accordingly, Defendant must be granted summary judgment on Plaintiff's "Public policy" claim.

## III.    CONCLUSION

Despite the massive record which has been created by Plaintiff over the course of seventeen depositions taken in this matter, the uncontroverted evidence indicates that there is no genuine issue of material fact, and Defendant P&G is entitled to judgment as a matter of law.  Accordingly, and for the reasons stated herein, Defendant respectfully requests that this Court grant it summary judgment as to all Counts plead against it in Plaintiff's Complaint.

Respectfully submitted,

Michael S. Glassman (0012713)
Tammy R. Geiger (0071533)
DINSMORE & SHOHL, LLP
1900 Chemed Center
255 East Fifth Street
Cincinnati, OH 45202
(513) 977-8200

Attorneys for Defendant, The Procter &
Gamble Company

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served via first class United States mail this 4th day of September, 2001 upon Kelly Mulloy Meyers, Esq., Freking & Betz, 215 East Ninth Street, Fifth Floor, Cincinnati, Ohio  45202 and James B. Robinson, Esq. Kircher Robinson & Welch, 2520 Kroger Building, 1014 Vine Street, Cincinnati, OH  45202-1116.

Tammy R. Geiger

692980v1

9103-213

25